## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JERRY MOORE**                                          **CIVIL ACTION**

**versus**                                              **NO. 10-676**

**N. BURL CAIN, WARDEN,**                               **SECTION: "B" (3)**
**LOUISIANA STATE PENITENTIARY**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Jerry Moore, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. On March 10, 2006, he was convicted of second degree murder

in violation of Louisiana law.[1]  On April 24, 2006, he was sentenced to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2]  On March 28, 2007, the Louisiana First Circuit Court of Appeal affirmed that conviction and sentence.[3]  The Louisiana Supreme Court then denied petitioner's related writ application on November 9, 2007.[4]

On June 20, 2008, petitioner filed with the state district court an application for post-conviction relief.[5]  That application was denied.[6]  Petitioner's related writ applications were then likewise denied by the Louisiana First Circuit Court of Appeal on November 25, 2008,[7] and by the Louisiana Supreme Court on October 16, 2009.[8]

On November 29, 2009, petitioner filed the instant federal application for *habeas corpus* relief.[9]  In his application, he asserts three claims:

---

[1] State Rec., Vol. VIII of XVI, trial transcript, p. 931; State Rec., Vol. I of XVI, minute entry dated March 10, 2006; State Rec., Vol. IV of XVI, jury verdict form.

[2] State Rec., Vol. VIII of XVI, transcript of April 24, 2006; State Rec., Vol. I of XVI, minute entry dated April 24, 2006.

[3] State v. Moore, No. 2006 KA 1979, 2007 WL 914637 (La. App. 1st Cir. Mar. 28, 2007); State Rec., Vol. XI of XVI.

[4] State v. Moore, 967 So.2d 500 (La. 2007) (No. 2007-K-0851); State Rec., Vol. IX of XVI.

[5] State Rec., Vol. IX of XVI.

[6] State Rec., Vol. IX of XVI, Reasons for Judgment dated July 22, 2008; see also State Rec., Vol. IX of XVI, Order dated December 2, 2008.

[7] State v. Moore, No. 2008 KW 1717 (La. App. 1st Cir. Nov. 25, 2008) (unpublished); State Rec., Vol. IX of XVI.

[8] State ex rel. Moore v. State, 19 So.3d 475 (La. 2009) (No. 2009-KH-0177); State Rec., Vol. IX of XVI.

[9] Rec. Doc. 1.

1.      There was insufficient evidence to support petitioner's conviction;

2.      Petitioner's rights were violated because he was not provided with an interpreter during interrogation, arraignment, and sentencing; and

3.      Petitioner received ineffective assistance of counsel.

The state concedes that the federal application is timely and that petitioner exhausted his state court remedies.[10]

<u>Motion to Stay</u>

Before turning to the federal application, the Court notes that petitioner has also filed a motion to stay these proceedings so that he may pursue a <u>Brady</u> claim[11] in the state courts.[12]  The state opposes that motion.[13]

In <u>Rhines v. Weber</u>, 544 U.S. 269 (2005), the United States Supreme Court explained that, in limited circumstances, it is appropriate for a federal district court to stay *habeas corpus* proceedings.  In <u>Rhines</u>, the petitioner had filed a "mixed petition" containing both exhausted and unexhausted claims.  He wanted to stay the federal proceedings, return to state court to pursue his

---

[10]  Rec. Doc. 17, pp. 4-5.

[11]  <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

[12]  Rec. Doc. 4.

[13]  Rec. Doc. 17, p. 5.

unexhausted claims, and then come back to federal court for review of his perfected petition. The Supreme Court noted that the entry of a stay is permissible in such proceedings but noted:

> Staying a federal habeas petition frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings. It also undermines AEDPA's goal of streamlining federal habeas proceedings by decreasing a petitioner's incentive to exhaust all his claims in state court prior to filing his federal petition. Cf. Duncan [v. Walker, 533 U.S. 167, 180 (2001)] ("[D]iminution of statutory incentives to proceed first in state court would ... increase the risk of the very piecemeal litigation that the exhaustion requirement is designed to reduce").
>
> For these reasons, stay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless. Cf. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

Rhines, 544 U.S. at 277 (emphasis added).

In the instant case, petitioner wants to stay these proceedings so that he may, *at some undetermined time in the future*, perhaps pursue a Brady claim in state court and, if unsuccessful, amend his federal petition to add such a claim for this Court's review. For the following reasons, such a stay would not be appropriate.

In his motion for a stay, petitioner indicates that his Brady claim is currently pending before the Louisiana Supreme Court. That is untrue. Petitioner has not yet presented a Brady claim in the state courts; rather, he has simply attempted to *obtain documents* which *might* support such

a claim in the future.  For example, on February 6, 2009, he filed with the state district court a "Motion for Production of Grand Jury Transcript and Tape Recording."[14]  However, that motion was denied by the state district court[15] and his related writ applications were likewise denied by both the Louisiana First Circuit Court of Appeal[16] and the Louisiana Supreme Court.[17]  Also, on March 18, 2009, petitioner filed with the state district court a "Motion for Production of Co-Defendant Jesse Montejo's Interrogation Statements."[18]  That motion was also denied,[19] the Court of Appeal denied the related writ application,[20] and the case is currently on review in the Louisiana Supreme Court in case number 09-KH-2185.[21]  Again, however, that pending application concerns only a request for documents, *not* a substantive <u>Brady</u> claim.

Therefore, at this point, petitioner has nothing but his own rank speculation that a <u>Brady</u> violation occurred.  He currently has no evidence to support such a claim, and it unclear whether he will ever have such evidence.  Therefore, he is essentially requesting that these federal

---

[14]  State Rec., Vol. X of XVI.

[15]  State Rec., Vol. X of XVI, Order dated February 26, 2009.

[16]  <u>State v. Moore</u>, No. 2009 KW 0560 (La. App. 1st Cir. July 9, 2009) (unpublished); State Rec., Vol. X of XVI.

[17]  <u>State *ex rel.* Moore v. State</u>, No. 2009-KH-1855, 2010 WL 2545506 (La. June 4, 2010); State Rec., Vol. XIII of XVI.

[18]  State Rec., Vol. X of XVI.

[19]  State Rec., Vol. X of XVI, Order dated May 4, 2009.

[20]  <u>State v. Moore</u>, No. 2009 KW 1023 (La. App. 1st Cir. Aug. 31, 2009) (unpublished); State Rec., Vol. X of XVI.

[21]  State Rec., Vol. XII of XVI.

proceedings be stayed indefinitely while he continues his quest to secure evidence so that a <u>Brady</u> claim can *perhaps* be asserted at some unknown time in the future. However, even under <u>Rhines</u>, federal petitions "should not be stayed indefinitely." <u>Rhines</u>, 544 U.S. at 277. To allow such a delay in this case for an open-ended fishing expedition in the state courts to collect evidence in support of a claim that may or may not ever be asserted would clearly thwart the AEDPA's objective of encouraging finality. Accordingly, petitioner's motion for a stay should be **DENIED**.

Moreover, for the following reasons, the claims in his federal petition should likewise be **DENIED**.

Standards of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of law, questions of fact, and mixed questions of law and fact. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002). Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and pure questions of fact are reviewed under § 2254(d)(2). <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28

U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways.  First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Courts cases but unreasonably applies it to the facts of the particular state prisoner's case.  Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000).  The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively

unreasonable, and we stressed in <u>Williams</u> that an unreasonable application is different from an incorrect one." <u>Bell</u>, 535 U.S. at 694.

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); <u>see also</u> 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

<u>Facts</u>

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> The victim, Lewis "Lou" Ferrari, owned and operated ten dry cleaning stores in St. Tammany Parish and Tangipahoa Parish. He employed the defendant for over ten years to repair equipment at the stores. The victim's daily routine included picking up deposits from the Mandeville stores and taking the money to the bank. It was a well-known fact that the victim kept his money in the trunk of his car.
>
> The victim was murdered on Thursday, September 5, 2002, a payday at his businesses. His Thursday routine included visiting his wife at their store on Gause, going to the grocery store after 3:30 p.m., and then meeting his wife and son for dinner at a restaurant between 6:00 p.m. and 6:15 p.m.
>
> Hugh "Captain Humble" Dillard testified at trial. He owned "Captain Humble's," a restaurant on Pontchartrain located next to "Vera's Valet," one of the victim's dry cleaning stores. On September 5, 2002, between 8:15 a.m. and 9:00 a.m., Dillard heard the victim and the defendant having a "really bad, bad fight." Dillard

was concerned for the victim's safety and asked his cook, Rich Garris, to come with him to the front of the restaurant to show the victim they were there to support him. The argument ended with the victim slamming the trunk of his car.

Birdie Sue Morrow also testified at trial. She was operations lady at Vera's Valet. On September 5, 2002, at approximately 9:15 a.m. or 9:30 a.m., the defendant and the victim were in the victim's office "loud talking." Thereafter, both men exited the office, and the victim stated to the defendant, "I am not afraid of you." Morrow had heard the victim make the same statement during an argument with the defendant approximately one month earlier. After the victim left Vera's Valet, the defendant left in a blue van driven by Jesse Montejo.

The victim's wife, Patricia Ferrari, indicated that in August and September of 2002 the relationship between the victim and the defendant had "spiraled down considerably" because the defendant would not respond to the victim's calls to work on equipment at the stores. Due to the defendant's failure to work, "the company" had decided to terminate his employment. She indicated the defendant knew the victim's routine and knew that he kept his money in the trunk of his car. Patricia Ferrari last saw the victim alive when he visited her on September 5, 2002 between 3:30 p.m. and 4:00 p.m. On September 5, 2002 at approximately 6:15 p.m., she went to look for the victim after he failed to meet her and their son at a restaurant. She discovered his body at their home. Groceries purchased by the victim were still in their bags on the kitchen counter. The victim's gun, which he kept in the nightstand, was missing. One of two floor safes had been opened.

The victim had been shot in the right eye and in the right side of his chest. The chest wound had been a contact wound. He was shot and killed with ammunition similar in size and with the same class characteristics as the ammunition provided to the police by his family. The victim's body did not reveal signs he had struggled and lividity was not fixed, indicating he had died within six to ten hours of being examined. Scrapings taken from under the nails of the victim's left hand matched the DNA of Montejo with the odds of a random match being approximately one in ten billion.

Patricia Ferrari indicated that in December 2000, the defendant had burglarized her vehicle but had been allowed to come back to work because the victim felt sorry for the defendant's children. Lewis Ferrari, III, the victim's son, also indicated the defendant knew the victim's routine, and that by September 2002,

"the company" had decided to terminate the employment of the defendant due to his unreliability. According to Lewis Ferrari III, at a conference between the victim and Lewis Ferrari III approximately one week before the victim's murder, the defendant walked into the room and stated to the victim, "I think I will just kill you," or "[Y]ou know, I will just kill you."

Police investigation indicated the blue van driven by Montejo had been seen in the victim's neighborhood between 4:15 p.m. and 4:35 p.m. on the day of the murder, and that the victim's car and the van were driven away from the victim's home at a high rate of speed at approximately 5:15 p.m. or 5:30 p.m. Additionally, the police believed that the victim had approximately $2,500 in his car. Approximately one-third of that amount was recovered following a search of the bedroom of Eric Gai (Montejo's stepbrother), and another third was connected to money spent by Montejo in the hours following the murder.

In an interview with the police on September 7, 2002, the defendant claimed Montejo first mentioned "rippin' Lou off" on Tuesday after picking up $20 from the victim. The defendant claimed he told Montejo, "No." The defendant claimed that on the Thursday of the murder, Montejo came over to his house at approximately 1:30 p.m., and then left to have lunch. When Montejo returned, he was asking about the victim, and the defendant claimed he repeatedly told Montejo, "No." The defendant claimed that, at approximately 2:30 p.m., he told Montejo that the Ferraris went out to dinner at approximately 6:00 p.m., and if "[Montejo] wanna go over there then do it." The defendant claimed he called Montejo at 5:00 p.m. and asked where he was. The defendant claimed Montejo stated he was "around the corner[.]" The defendant claimed he then asked if Grant, who ran a cleaner's in Mandeville, had called, and when Montejo answered negatively, the defendant said "bye." When asked where he thought Montejo was when he said he was "around the corner," the defendant stated he thought Montejo was around the corner from the victim's house. The defendant claimed he next saw Montejo at approximately 7:30 p.m. Montejo looked nervous and stated, "something went wrong." The defendant claimed Montejo told him that Montejo had taken a black man from Algiers with him to the victim's house, and the victim had come home. The defendant claimed that when Montejo revealed that the black man had shot the victim twice, the defendant stated he did not want to hear any more. The defendant claimed Montejo then said that the victim had pulled out a gun and Montejo had shot him. He also stated the other guy

had shot the victim. When asked if Montejo had disclosed how much money he got, the defendant claimed Montejo had not, but then added the defendant knew that the victim kept "at least a thousand, two thousand dollars in his car[.]" The defendant indicated he "helped out" with the burglary, but did not know the victim would be coming home and did not know anyone would be killed. The defendant stated he told Montejo that the victim's garage would be open, when the Ferraris would be going out to eat, and that the money would probably be in the bedroom. The defendant claimed Montejo tried to give him $700 or $800, but the defendant refused to take the money, with the exception of $60, which Montejo owed him.

The defendant also testified at trial. He claimed on the day of the murder he spent the morning repairing the toilet in his bathroom. He claimed Montejo came over in the morning, close to lunchtime. Montejo allegedly stated he needed money and asked about burglarizing the victim's house. The defendant claimed he told Montejo that he did not do residential burglaries, but Montejo kept asking about burglarizing the victim's house. After Montejo left for lunch and returned, the defendant referred Montejo to Grant, who ran a cleaner's in Mandeville, as a potential source of work. The defendant claimed he told Montejo that if he (Montejo) was unable to make money with Grant, the defendant would give Montejo the money he needed.

The defendant claimed Montejo left between 1:30 p.m. and 2:30 p.m., stating he was going to visit his brother. The defendant claimed that a neighbor told him that Terry Boudreaux needed him to come over and bleed the brakes on his van. The defendant claimed that between 3:30 p.m. and 4:00 p.m., he called Montejo to see if he was at his brother's house in Gretna, but Montejo was in Slidell. The defendant claimed he went to Boudreaux's house and did not return back home until close to dark.

The defendant claimed that at approximately 7:30 p.m., Montejo came back to the defendant's house. Montejo handed the defendant some money and stated: "something went wrong." The defendant claimed Montejo stated that the victim had seen him and he had to run. The defendant also claimed Montejo indicated he had taken a black man over to the victim's house. The defendant claimed he tried to stop Montejo from telling him anymore, but Montejo stated the victim had been shot. The defendant claimed he returned the money to Montejo with the exception of $60, which Montejo owed him. The defendant conceded he had four felony convictions.

The defendant claimed he met Montejo approximately three weeks before the murder, while hitchhiking. The defendant claimed he paid Montejo to give him rides to work. The defendant claimed he talked to Montejo about burglaries because Montejo had just been released from prison after serving six years for burglaries. The defendant claimed that, weeks before the murder, Montejo asked to meet him at the victim's house and asked him if the Ferraris left the garage door open. The defendant told Montejo, "I think so."

The defendant denied being at Vera's Valet and arguing with the victim on the day of the murder. He also denied ever threatening the victim. He claimed Lewis Ferrari, III had misunderstood the defendant's statement, "I'll kill your smile." The defendant denied any knowledge that the victim had a gun. He denied ever having a weapon, and denied seeing Montejo with a gun. He also denied that Montejo had ever spoken about any "violent stuff."

The defendant claimed that on the Tuesday before the murder, the victim wanted him to work at one of his stores, and the defendant sent Montejo to the victim to get $20 for gas. The defendant claimed Montejo showed up later with the $20 and stated, "Man, you know, this guy is loaded." The defendant claimed that Montejo had seen how much money the victim had in his briefcase. The defendant conceded that he may have told Montejo that the Ferraris got off at six and went out to dinner on Thursdays.[22]

## Sufficiency of the Evidence

Petitioner first claims that there was insufficient evidence to support his conviction.

On direct appeal, the Louisiana First Circuit Court of Appeal rejected that claim, holding:

> [T]he defendant argues he only discussed the commission of a burglary of an inhabited dwelling with Montejo and did not discuss using a weapon to commit the burglary or to harm the victim.
>
> The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a

[22] State v. Moore, No. 2006 KA 1979, 2007 WL 914637, at *1-3 (La. App. 1st Cir. Mar. 28, 2007); State Rec., Vol. XI of XVI.

reasonable doubt. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove, in order to convict," every reasonable hypothesis of innocence is excluded. State v. Wright, 98-0601, p. 2 (La.App. 1 Cir. 2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La. 10/29/99), 748 So.2d 1157, 2000-0895 (La. 11/17/00), 773 So.2d 732 (quoting La. R.S. 15:438).

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Id. at p. 3, 730 So.2d at 487.

The State's main theory at trial was that the defendant was guilty of second degree murder because he was a principal to an aggravated burglary,[FN2] armed robbery,[FN3] first degree robbery,[FN4] or simple robbery [FN5] at the victim's home, and the victim was killed during the commission of the offense.

> [FN2] Aggravated burglary is the unauthorized entering of any inhabited dwelling where a person is present, with the intent to commit a felony or any theft therein, if the offender: is armed with a dangerous weapon; or after entering, arms himself with a dangerous weapon; or commits a battery upon any person while in such place, or in entering or leaving such place. La. R.S. 14:60.

> [FN3] Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64(A).

> [FN4] First degree robbery is the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender

leads the victim to reasonably believe he is armed with a dangerous weapon. La. R.S. 14:64.1(A).

[FN5]  Simple robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, but not armed with a dangerous weapon. La. R.S. 14:65(A).

Second degree murder is the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of aggravated burglary, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(2)(a).

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24.

However, the defendant's mere presence at the scene is not enough to "concern" him in the crime. Only those persons who knowingly participate in the planning or execution of a crime may be said to be "concerned" in its commission, thus making them liable as principals. A principal may be connected only to those crimes for which he has the requisite mental state. State v. Neal, 2000-0674, pp. 12-13 (La. 6/29/01), 796 So.2d 649, 659, cert. denied, 535 U .S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

State v. Smith, 98-2078 (La. 10/29/99), 748 So.2d 1139 (per curiam), involved the convictions of Jerry Smith, Gerrick Watts, and Bernard Myles for the second degree murder of the victim, Nazier "Mickey" Simmons. Id. at pp. 1-2, 748 So.2d at 1139-40. The defendants reached a common understanding that they would take money from the victim's home, which they felt was owed to them for working at the victim's bar. Id. at p. 2, 748 So.2d at 1140. While in the victim's home, the defendants were surprised by the unexpected arrival of the victim and his wife at the front door. Id. at pp. 3-4, 748 So.2d at 1141. Thereafter, Watts fatally shot the victim. Id. According to Watts and the other defendants, only Watts knew of the gun he had concealed in his waistband on the night in question and which he used to shoot the victim. Id. at p. 3; 748 So.2d at 1141.

In examining whether defense counsel labored under an actual conflict of interest, the court in <u>Smith</u> examined the felony-murder doctrine as applicable under the facts of the case, to-wit:

> In the context of a second degree, felony murder prosecution, Myles and Smith could not defend themselves simply by casting full blame on Watts for the murder of Simmons. Given their self-confessed intent to take Simmons's cash, all three defendants became responsible for the victim's murder if a jury determined that they had made an unauthorized and therefore illegal entry onto the premises, no matter how Smith and Myles sought to distance themselves from the fatal shots fired by Watts and without regard to whether they had even been aware that their companion was armed. In felony murder, "the mens rea of the underlying felony [provides] the malice necessary to transform an unintended homicide into a murder." <u>State v. Kalathakis</u>, 563 So.2d 228, 231 (La.1990) (footnotes and citations omitted); see also 2 Wayne R. LaFave and Austin W. Scott, Jr., <u>Substantive Criminal Law</u>, § 7.5, pp. 211-12 (1986). Moreover, under general principles of accessorial liability, see La. R.S. 14:24, "all parties [to a crime] are guilty for deviations from the common plan which are the foreseeable consequences of carrying out the plan." 2 LaFave and Scott, <u>Substantive Criminal Law</u>, § 7.5, p. 212; <u>see also</u> <u>State v. Anderson</u>, 97-1301, p. 3 (La. 2/6/98), 707 So.2d 1223, 1224 ("Acting in concert, each man then became responsible not only for his own acts but for the acts of the other."). The risk that an unauthorized entry of an inhabited dwelling may escalate into violence and death is a foreseeable consequence of burglary which every party to the offense must accept no matter what he or she actually intended. <u>See</u> <u>State v. Cotton</u>, 341 So.2d 362, 364 (La. 1976) (if the co-perpetrator in an aggravated burglary was guilty of second degree murder because he shot and killed the victim, then Cotton, "as a principal [in the burglary] was likewise guilty of the same offense."). As we observed in <u>State v. Lozier</u>, 375 So.2d 1333, 1337 (La. 1979),

"[b]urglary laws are not designed primarily to protect the inhabitant from unlawful trespass and/or the intended crime, but to forestall the germination of a situation dangerous to the personal safety of the occupants.... In the archetypal burglary an occupant of a dwelling is startled by an intruder who may inflict serious harm on the occupant in his attempt to commit the crime or to escape from the house." A homicide committed during flight from an aggravated burglary, or to facilitate flight from the scene, therefore constitutes felony murder. State v. Anthony, 427 So.2d 1155, 1159 (La. 1983).

Smith, 98-2078 at pp. 7-8, 748 So.2d at 1143.

A thorough review of the record in this matter indicates that the evidence presented herein, viewed in the light most favorable to the State, proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant's identity as a principal to that offense. The evidence thus viewed indicated the defendant knowingly participated in the planning of the robbery or burglary that took the victim's life. The *mens rea* of the underlying felony provided the malice necessary to transform an unintended homicide into a murder. See Smith, 98-2078 at pp. 7-8, 748 So.2d at 1143.

This assignment of error is without merit.[23]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000). For the following reasons, the Court finds that petitioner has made no such showing.

---

[23] State v. Moore, 2007 WL 914637, at *4-6; State Rec., Vol. XI of XVI.

Under federal law, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added). Moreover, Louisiana's circumstantial evidence standard requiring that the every reasonable hypothesis of innocence be excluded does *not* apply in federal *habeas corpus* proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, No. 08-30721, 2010 WL 1427372 (5th Cir. Apr. 9, 2010).

For the reasons noted by the state court, the testimony and physical evidence presented in the instant case, viewed in the light most favorable to the prosecution, were clearly sufficient for any rational trier of fact to find petitioner guilty beyond a reasonable doubt. Therefore, he cannot show that the state court's decision rejecting his claim was contrary to, or involved an

unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, this Court should defer to the state court's decision rejecting that claim.

Absence of Interpreter

Petitioner next claims that his rights were violated because he was not provided with an interpreter during interrogation, arraignment, and sentencing. On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> [T]he defendant argues he had the right to an interpreter at interrogation, arraignment, and sentencing on the basis of La. R.S. 46:2361, 46:2363, 46:2364, and 15:270, and thus, the trial court erred in denying his motion to suppress his statements and erred in not providing an interpreter at arraignment and sentencing.
> Louisiana Revised Statutes 46:2361 provides:
>
> > It is the policy of this state to secure the rights of persons with hearing impairments who cannot readily understand or communicate in spoken languages and who consequently cannot equally participate in or benefit from proceedings, programs, and activities of the courts, legislative bodies, administrative agencies, licensing commissions, departments, and boards of the state and its subdivisions unless qualified interpreters/transliterators are available to facilitate communication.
>
> Louisiana Revised Statutes 46:2363 provides:
>
> > The right of a hearing-impaired person [FN6] to the services of an interpreter/transliterator may not be waived except by a hearing-impaired person who requests a waiver. The failure of the hearing-impaired person to request the services of an interpreter/transliterator is not deemed a waiver of that right.

– 18 –

[FN6] A "hearing-impaired" person means a person who, because of a hearing impairment, has difficulty understanding the communication occurring. La. R.S. 46:2362(2).

Louisiana Revised Statutes, in pertinent part, provides:

A. Whenever a hearing-impaired person is a party or witness at any stage involving direct communication with hearing-impaired persons or his legal representative or custodian during any judicial or quasi-judicial proceeding in this state or in its political subdivisions, including but not limited to proceedings of civil and criminal court, grand jury, before a magistrate, juvenile, adoption, mental health commitment, and any proceeding in which a hearing-impaired person may be subjected to confinement or criminal sanction, the appointing authority shall appoint and pay for a qualified interpreter/transliterator to interpret or transliterate the proceedings to the hearing-impaired person and to interpret or transliterate the hearing-impaired person's testimony.

Louisiana Revised Statutes, in pertinent part, provides:

A. In all criminal prosecutions, where the accused is deaf or severely hearing-impaired, he shall have the proceedings of the trial interpreted to him in a language that he can understand by a qualified interpreter appointed by the court. In all cases where the mental condition of a person is being considered and where such person may be committed to a mental institution, and where such person is deaf or severely hearing-impaired, all of the court proceedings pertaining to him shall be interpreted by a qualified interpreter appointed by the court. The qualification of an interpreter as an expert witness is governed by the Louisiana Code of Evidence.

B. (1) In any case where an interpreter is required to be appointed by the court under this Section, the court shall not commence proceedings until the appointed interpreter is in court.

(2) The interpreter appointed in accordance with this Section shall take an oath or affirmation that he will make a true interpretation to the deaf or severely hearing-impaired person accused or being examined of all the proceedings of his case in a language that he understands, and that he will repeat said deaf or severely hearing-impaired person's answer to questions to counsel, court or jury, to the best of his skill and judgment.

(3) Interpreters appointed in accordance with this Section shall receive for their services an amount to be fixed by the judge presiding. When travel of the interpreter is necessary, all of the actual expenses of travel, lodging, and meals incurred by the interpreter in connection with the case in which he is appointed to serve shall be paid at the same rate applicable to state employees.

The issue of whether the defendant was provided an interpreter during questioning was addressed at the hearing on the defendant's motion to suppress his statements.

St. Tammany Parish Sheriff's Office Sergeant James Davis indicated that on September 6, 2002 at approximately 1:30 p.m., he came in contact with the defendant to take a statement from him. Sergeant Davis advised the defendant of his Miranda rights, the defendant indicated he understood those rights, and the defendant signed the portion of the rights-waiver form indicating he understood his rights. Sergeant Davis noticed the defendant had a problem with articulating certain words and wore a hearing aid. However, Sergeant Davis spoke loudly, and the defendant answered the questions asked of him and appeared to understand the questions. Sergeant Davis did not ask the defendant if he needed an interpreter, and the defendant did not ask for an interpreter.

St. Tammany Parish Sheriff's Office Detective Ralph Sacks indicated that on September 7, 2002 he came in contact with the defendant to take a statement from him. St. Tammany Parish

Sheriff's Office Detective Johnny Morse read the defendant his Miranda rights, and the defendant indicated he understood those rights. Detective Sacks noticed the defendant had a hearing loss, and thus, spoke loudly and in close proximity to the defendant. The defendant answered the questions asked of him and appeared to understand the questions. Detective Sacks did not ask the defendant if he needed an interpreter, and the defendant did not ask for an interpreter.

St. Tammany Parish Sheriff's Office Detective Wade Major indicated that on September 7, 2002 at approximately 6:15 p.m., he came in contact with the defendant to take a statement from him. St. Tammany Parish Sheriff's Office Detective Johnny Morse read the defendant his Miranda rights, and the defendant indicated he understood those rights. Detective Major noticed the defendant had a hearing loss, and thus, spoke loudly and faced the defendant as he questioned him. The defendant answered the questions asked of him and appeared to understand the questions. Detective Major did not ask the defendant if he needed an interpreter, and the defendant did not ask for an interpreter.

St. Tammany Parish Sheriff's Office Detective Jerry Hall indicated that on September 6, 2002 he came in contact with the defendant in Gretna, and the defendant agreed to accompany Detective Hall back to St. Tammany Parish. At approximately 3:03 a.m. Detective Hall advised the defendant of his Miranda rights, and the defendant indicated he understood those rights, and signed the rights-waiver portion of the rights form. Detective Hall noticed the defendant was wearing a hearing aid, and thus, spoke "fluidly" and looked straight at the defendant while they spoke. Detective Hall did not question the defendant concerning the homicide of the victim. The defendant answered the questions asked of him and appeared to understand the questions. Detective Hall did not offer the defendant an interpreter, and the defendant did not ask for an interpreter.

The defendant also testified at the suppression hearing. He claimed he had suffered from hearing problems his entire life. He claimed he tried to read people's lips, and did not hear people unless they spoke to him directly. He indicated he wore hearing aids in both ears, but the aids did not allow him to understand someone unless he could also read their lips.

On cross-examination, the defendant conceded he had spoken to the victim, Montejo, and others using a telephone and was not able to see the speaker's lips moving. He claimed, however, his telephone amplified voices.

The defendant claimed that at the time he was questioned concerning the offense, he was only wearing one hearing aid with a borrowed mold. He conceded, however, that he read his <u>Miranda</u> rights as they were explained to him. At trial, the defense presented testimony from Dr. David Muller, an expert in the field of audiology. Dr. Muller indicated the defendant was legally deaf and had a severe to profound bilateral, sensory neural, non-medically remedial hearing loss. Dr. Muller conceded, however, that the defendant did have residual hearing across many speech frequencies that permitted him to use amplification, i.e., hearing aids, to aid him in his speech-reading ability.

On cross-examination, Dr. Muller indicated that he tested the defendant's hearing while the defendant was not assisted by any hearing aids. Dr. Muller also conceded that he told the defendant that he (Dr. Muller) would be testifying in the defendant's case at trial, and the defendant could have overemphasized his hearing loss during the testing.

The trial court denied the motion to suppress. The court found the defendant understood the rights given to him and had testified he had read the rights forms and knew what they contained. The court noted that if a person has a hearing deficiency to the extent that he requires an interpreter, the burden is on that person to request an interpreter, especially in view of the fact that the officers testified the defendant's responses to their questions were appropriate. The court further noted it had observed the defendant during his testimony and the interpreter's role in the questioning of the defendant.

Initially, even were the defendant to be considered "deaf or severely hearing-impaired," Louisiana Revised Statutes 15:270 does not concern interrogation, arraignment, or sentencing and thus is inapplicable to the defendant's argument.[FN7]

[FN7] The defendant moved for, and was granted, an interpreter at trial.

Further, as set forth in La. R.S. 46:2361, La. R.S. 43:2363 and 43:2364 concern the rights of persons with hearing impairments who cannot readily understand or communicate in spoken languages. The defendant's testimony, his recorded statements, and the testimony of the interviewing officers do not indicate he is a person with hearing impairments who cannot readily understand or communicate in spoken languages.

The defendant failed to move for an interpreter at arraignment or sentencing. An irregularity or error cannot be availed of after verdict unless, at the time the ruling or order of the court was made or sought, the party made known to the court the action which he desired the court to take, or of his objections to the action of the court, and the grounds therefor. La. Code Crim. P. art. 841.

It is well settled that for a confession or inculpatory statement to be admissible into evidence, the State must affirmatively show that it was freely and voluntarily given without influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. R.S. 15:451. Additionally, the State must show that an accused who makes a statement or confession during custodial interrogation was first advised of his <u>Miranda</u> rights. <u>State v. Plain</u>, 99-1112, p. 5 (La.App. 1 Cir. 2/18/00), 752 So.2d 337, 342.

The admissibility of a confession is, in the first instance, a question for the trial court; its conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession are accorded great weight and will not be overturned unless they are not supported by the evidence. Whether a showing of voluntariness has been made is analyzed on a case-by-case basis with regard to the facts and circumstances of each case. The trial court must consider the totality of the circumstances in deciding whether or not a confession is admissible. <u>Plain</u>, 99-1112 at p. 6, 752 So.2d at 342.

The trial court's conclusions on the credibility and weight of the testimony relating to the voluntary nature of the defendant's statements are supported by the defendant's testimony, his recorded statements, and the testimony of the interviewing officers, and thus, will not be overturned.

This assignment of error is without merit.[24]

To the extent that petitioner is arguing that the trial court misapplied *state* laws concerning the provision of interpreters, such a claim is not cognizable in this federal *habeas corpus* proceeding. "'[I]t is not the province of a federal *habeas* court to reexamine state-court determinations on state-law questions.'" <u>Trevino v. Johnson</u>, 168 F.3d 173, 184 (5th Cir. 1999)

---

[24] <u>State v. Moore</u>, 2007 WL 914637, at *6-10; State Rec., Vol. XI of XVI.

(quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)); Dickerson v. Guste, 932 F.2d 1142, 1145 (5th Cir. 1991) ("We will not review a state court's interpretation of its own law in a federal habeas corpus proceeding. We do not sit as a 'super' state supreme court in such a proceeding to review errors under state law.") (internal citation and quotation marks omitted). Therefore, even if the state courts in fact misapplied state law, that alone would be of no moment in this proceeding. Federal *habeas corpus* relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice. 28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983).

To the extent that petitioner is arguing that he is entitled to *habeas* relief because his federal constitutional rights were violated by the failure to provide an interpreter, he is incorrect for the following reasons.

Regarding statements obtained from custodial interrogations, the United States Supreme Court has held:

> [T]he accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived Miranda rights when making the statement. The waiver inquiry has two distinct dimensions: waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Berghuis v. Thompkins, 130 S.Ct. 2250, 2260 (2010) (citations, quotation marks, and brackets omitted). The Supreme Court continued:

> If the State establishes that a Miranda warning was given and the accused made an uncoerced statement, this showing, standing alone,

is insufficient to demonstrate a valid waiver of <u>Miranda</u> rights. The prosecution must make the additional showing that the accused understood these rights. Where the prosecution shows that a <u>Miranda</u> warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.

<u>Id</u>. at 2261-62 (citations and quotation marks omitted).

In the instant case, the evidence showed that petitioner was given the required <u>Miranda</u> warnings, told the interrogating officers that he understood his rights, signed the written waivers of his rights, and was in no way coerced into giving the statements. Moreover, petitioner does not allege, much less prove, otherwise.

On the contrary, petitioner appears to be contending only that he had an absolute right to an interpreter during the interrogations and that the mere failure to provide one automatically rendered his statements involuntary. However, the United States Supreme Court has never held that hearing-impaired individuals have a constitutional right to have an interpreter present during interrogations or that the absence of such an interpreter renders any resulting statements involuntary or inadmissible. Where, as here, the jurisprudence of the United States Supreme Court "give[s] no clear answer to the question presented, let alone one in [petitioner's] favor," it cannot be said that a state court's ruling impermissibly ran afoul of "clearly established Federal law" for purposes of § 2254(d)(1). <u>Wright v. Van Patten</u>, 522 U.S. 120, 126 (2008); <u>see</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 381 (2000) ("If this Court has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); <u>see also</u> <u>Bourgeois v. Bergeron</u>, Civ. Action No. 09-

3185, 2009 WL 5088756, at *6 (E.D. La. Dec. 23, 2009); Odom v. Wheat, Civ. Action No. 09-3028, 2009 WL 3199178, at *5 (E.D. La. Sept. 30, 2009). Therefore, this claim fails.

Petitioner's claim that his rights were violated because he was not provided with an interpreter during the arraignment and sentencing fails for the same reason. "The United States Supreme Court has yet to recognize the right to a court-appointed interpreter as a constitutional one." United States v. Johnson, 248 F.3d 655, 663 (7th Cir. 2001); see also DeQuin v. Cunningham, No. 07CV31, 2009 WL 899434, at *3 (W.D.N.Y. Mar. 26, 2009); Hoke v. Miller, No. 02-CV-0516, 2007 WL 2292992, at *5 (N.D.N.Y. Aug. 6, 2007) ("Petitioner failed to cite and this Court could not locate any established Supreme Court precedent indicating that due process demands that specific accommodations be made to address a defendant's hearing difficulties.").

Moreover, in any event, petitioner was *not* denied an interpreter *at trial*, such that his right to confront witnesses or assist in his defense might arguably have been implicated. Rather, his complaint is only that he was not additionally afforded an interpreter at his *arraignment* and *sentencing*. However, he does not allege, much less prove, that he requested an interpreter for those proceedings or that he suffered any prejudice whatsoever from the lack of an interpreter. See DeQuin, 2009 WL 899434, at *3. As the court noted in DeQuin:

> [T]he petitioner has not demonstrated that he suffered any prejudice from the fact that he was not provided a sign language interpreter at the time of his arraignment. The petitioner has not identified any incriminating statements made by him at that time. The Supreme Court has *not* held that a defendant has an absolute right to an interpreter and that the failure to provide one at any stage of a criminal prosecution violates the constitutional rights of the defendant regardless of whether the lack of an interpreter actually prejudiced the defendant. Thus, the petitioner is not entitled to habeas corpus relief based upon this claim.

Id.

For all of these reasons, the Court finds that petitioner has not established that he is entitled to federal *habeas corpus* relief with respect to this claim.

Ineffective Assistance of Counsel

Petitioner also claims that he received ineffective assistance of counsel. When petitioner asserted this claim in the state post-conviction proceedings, the state district court denied the claim, noting that petitioner had "failed to prove grounds upon which relief shall be granted."[25] Without assigning additional reasons, the Louisiana First Circuit Court of Appeal and the Louisiana Supreme Court likewise denied relief.[26] Because a claim of ineffective assistance of counsel is a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). For the following reasons, the Court finds that neither of those conditions is met in the instant case.

The United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and

---

[25] State Rec., Vol. IX of XVI, Reasons for Judgment dated July 22, 2008; see also State Rec., Vol. IX of XVI, Order dated December 2, 2008.

[26] State v. Moore, No. 2008 KW 1717 (La. App. 1st Cir. Nov. 25, 2008), writ denied, 19 So.3d 475 (La. 2009); State Rec., Vol. IX of XVI.

"must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." <u>Jernigan v. Collins</u>, 980 F.2d 292, 296 (5th Cir. 1993); <u>see also</u> <u>Clark v. Johnson</u>, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. <u>Strickland</u>, 466 U.S. at 697.

To prevail on the deficiency prong of the <u>Strickland</u> test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. <u>See</u> <u>Styron v. Johnson</u>, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." <u>Little v. Johnson</u>, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. <u>See</u> <u>Strickland</u>, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (quoting <u>Strickland</u>, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. <u>See</u> <u>Crockett v. McCotter</u>, 796 F.2d 787, 791 (5th Cir. 1986); <u>Mattheson v. King</u>, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id</u>. In making a

determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Petitioner first claims that counsel was ineffective for failing to conduct an adequate pretrial investigation. It is clear that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. Moreover, the mere fact that counsel's pretrial investigation failed to exhaust every possible avenue for exploration is not determinative. See Lovett v. Florida, 627 F.2d 706, 708 (5th Cir. 1980) ("[C]ounsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers."). Additionally, and perhaps most importantly, to prevail on a claim for inadequate investigation, a petitioner must provide factual support as to what further investigation would have revealed. See Moawad v. Johnson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008).

In the instant case, petitioner faults counsel for failing to procure a videotape from Walmart which petitioner alleges would have revealed that he was shopping at the time he allegedly argued with the victim on the day of the murder. However, there is no evidence whatsoever that such a videotape in fact exists or would show what petitioner alleges. Without such evidence,

petitioner's claim necessarily fails because he cannot show that he was prejudiced by counsel's failure to procure the videotape.

Petitioner next alleges that counsel was ineffective in failing to perform pretrial discovery. That allegation is false. Discovery was performed.[27] Accordingly, this allegation is meritless.

Petitioner also claims that counsel was ineffective for failing to call at trial the following witnesses: Mary Moore, petitioner's wife; Jennifer Moore, his daughter; Terry Boudreaux; and Eric Gai, Jesse Montejo's stepbrother. However, it is clear that "complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002). Therefore, to show the prejudice required to support an ineffective assistance claim premised on the failure to call a witness, a petitioner must show that the witness was available and would in fact have testified at trial in a manner beneficial to the defense. Id.; see also Bray v. Quarterman, 265 Fed. App'x 296, 298 (5th Cir. 2008). Here, petitioner has never presented either the state court or this Court with any evidence whatsoever in support of his bald allegations that the witnesses were available and would have been willing to testify at trial in a manner beneficial to the defense. Accordingly, he has not met his burden of proof, and his claim necessarily fails. See Evans, 285 F.3d at 377 (a petitioner must bring forth evidence, such as affidavits from the uncalled witness, in support of his claim); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D.

---

[27] See, e.g., State Rec., Vol. I of XVI, Motion for Bill of Particulars and Discovery and Inspection.

La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance."); Daigle v. Travis, Civ. Action No. 07-9425, 2008 WL 3562458, at *10 (E.D. La. Aug. 12, 2008); see also Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001) ("A prisoner's bald conclusory assertion that supposed 'alibi' witnesses were not called does not serve to overcome the strong presumption that his counsel's actions were reasonable." (quotation marks omitted)).

Lastly, petitioner argues that even if his contentions regarding counsel's ineffectiveness do not warrant relief when considered individually, relief is warranted when they are considered cumulatively. Petitioner is incorrect. Where, as here, the individual contentions are meritless, that result cannot be changed simply by asserting them collectively. Pondexter v. Quarterman, 537 F.3d 511, 525 (5th Cir. 2008), cert. denied, 129 S.Ct. 1544 (2009); United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006); Miller v. Johnson, 200 F.3d 274, 286 n.6 (5th Cir. 2000); Sholes v. Cain, Civ. Action No. 06-1831, 2008 WL 2346151, at *17 (E.D. La. June 6, 2008), aff'd, No. 08-30654, 2010 WL 1141590 (5th Cir. Mar. 25, 2010); Simms v. Cain, Civ. Action No. 07-966, 2008 WL 624073, at *26 (E.D,. La. Mar. 8, 2008); Spicer v. Cain, Civ. Action No. 07-3770, 2007

WL 4532221, at *10 (E.D. La. Dec. 19, 2007); <u>Franklin v. Thompson</u>, Civ. Action No. 07-543, 2007

WL 3046642, at *13 (E.D. La. Oct. 17, 2007).  As the United States Fifth Circuit Court of Appeals

noted with respect to analogous claims of cumulative error:  "Twenty times zero equals zero."

<u>Mullen v. Blackburn</u>, 808 F.2d 1143, 1147 (5th Cir. 1987).

 In summary, petitioner has failed to demonstrate that the state court's decision

denying his ineffective assistance of counsel claim was contrary to, or involved an unreasonable

application of, clearly established federal law, as determined by the Supreme Court of the United

States.  Accordingly, applying the AEDPA's deferential standard, this Court should likewise reject

the claim.

## **<u>RECOMMENDATION</u>**

 Accordingly, **IT IS RECOMMENDED** that petitioner's motion to stay, Rec. Doc.

4, be **DENIED**.

 **IT IS FURTHER RECOMMENDED** that petitioner's application for federal

*habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

 A party's failure to file written objections to the proposed findings, conclusions, and

recommendation in a magistrate judge's report and recommendation within fourteen (14) days after

being served with a copy shall bar that party, except upon grounds of plain error, from attacking on

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district

court, provided that the party has been served with notice that such consequences will result from

a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[28]

New Orleans, Louisiana, this twenty-fifth day of August, 2010.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[28] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.